# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

RONALD FARNER,  :
                         :
          Plaintiff  :    No. 3:15-CV-1559
                         :
        vs.  :    (Judge Nealon)
                         :
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
                         :
        Defendant  :

**FILED
SCRANTON**

FEB 17 2017

PER ——— DEPUTY CLERK

## MEMORANDUM

On August 10, 2015, Plaintiff, Ronald Farner, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his applications for DIB and SSI on September 29, 2011, alleging disability beginning on December 30, 2010, due to a combination of heart problems, prior kidney cancer, diabetes, high blood pressure, neuropathy, and high cholesterol. (Tr. 257, 261).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on August 9, 2011.  (Tr. 111).  On September 27, 2011, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 121).  An initial hearing was held on September 20, 2012, before administrative law judge Randy Riley, ("ALJ"), at which Plaintiff, his wife, and an impartial vocational expert Michael Gimlin testified. (Tr. 49-84).  Initially, the ALJ issued a a unfavorable decision denying Plaintiff's applications for DIB and SSI, and the Appeals Council remanded the matter back to the ALJ for a second hearing.  (Tr. 31-47).  On April 15, 2014, a remand

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 1, 2015.  (Doc. 13).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

hearing was held before the ALJ, and Plaintiff, vocational expert Brian Bierly,

("VE"), and medical expert David Owens, ("ME"), testified. (Tr. 30-48). On

April 24, 2014, the ALJ issued an unfavorable decision denying Plaintiff's

applications for SSI and DIB. (Tr. 12-30). On June 5, 2014, Plaintiff filed a

request for review with the Appeals Council. (Tr. 9). On June 10, 2015, the

Appeals Council concluded that there was no basis upon which to grant Plaintiff's

request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision

of the Commissioner.

Plaintiff filed the instant complaint on August 10, 2015. (Doc. 1). On

December 1, 2015, Defendant filed an answer and transcript from the SSA

proceedings. (Docs. 12 and 13). Plaintiff filed a brief in support of his complaint

on January 11, 2016. (Doc. 16). Defendant filed a brief in opposition on February

11, 2016. (Doc. 17). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on December 12, 1959, and at all

times relevant to this matter was considered an "individual closely approaching

advanced age."[6] (Tr. 257). Plaintiff did not graduate from high school or obtain

---

6. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

his GED, but can communicate in English.  (Tr. 260, 262).  His employment records indicate that he previously worked as a maintenance mechanic for a tire manufacturer and a mechanic for several auto shops.  (Tr. 262).

In a document entitled "Function Report - Adult" filed with the SSA on July 25, 2011,  Plaintiff indicated that he lived in a house with family.  (Tr. 280). When asked how his injuries, illness or conditions limited his ability to work, Plaintiff stated, "fatigue, feet hurt bad, can't stand for long periods. My chest and body hurts (sic) a lot when I do things too long.  I feel grumpy a lot and have trouble concentrating.  Also my legs swell - hurt a lot."  (Tr. 280).  From the time he woke up until he went to bed, Plaintiff did the laundry and dishes and made dinner, and mostly in the seated position down and only for "short periods" of time. (Tr. 281).  Plaintiff reported no difficulty with personal care, was able to prepare meals three (3) to four (4) times a week for about one (1) hour at a time, did the laundry and dishes, was able to mow the lawn on a riding lawn mower, and was able to engage in "small repair tasks." (Tr. 282).  He was able to drive a car alone. (Tr. 283).  He went shopping one (1) to two (2) times a week for "as little as possible [because he could not] stand [for] too long." (Tr. 283).  His hobbies included watching television, fishing, hunting, camping, wood working, and repairing. (Tr. 283).   He went on family outings on a regular basis.  (Tr. 284).  He

4

could walk for five hundred (500) feet before needing to rest for about five (5) to ten (10) minutes. (Tr. 285). When asked to check what activities his illnesses, injuries, or conditions affected, Plaintiff did not check reaching, sitting, talking, understanding, following instructions, using hands, or getting along with others. (Tr. 285).

Regarding his concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, but did need reminders to take medicine and go places. (Tr. 282, 284). He could count change, pay bills, handle a savings account, and use a checkbook. (Tr. 283). He could pay attention for about five (5) minutes,  was not always able to finish what he started, did not follow written and spoken instructions well, and did not handle stress or changes in routine well. (Tr. 285-286).

At the initial hearing on September 20, 2012, Plaintiff testified that he was able to take care of his personal needs, shop every other week for "a little bit," cook with breaks, do the dishes, vacuum and sweep once in a while, maintain his yard with help from his children, drive a vehicle once in a while, and could walk about five hundred (500) yards and stand in one (1) position for no more than fifteen (15) minutes before needing to sit due to pain in his legs and feet. (Tr. 53-56, 62-63). He testified he did not do laundry, was unable to bend over to put on

5

his socks or pick something up, had trouble climbing steps, and did not take out the trash because his "trash can is pretty far away and [he did not] like walking over to it." (Tr. 55-56, 64). He stated he took pain medications that he "guessed" were helping, but that he experienced side effects such as shakiness, sleepiness, and dizziness. (Tr. 56-57). He also would sit down and elevate his feet, but testified that doing so did not take his pain away completely. (Tr. 65).

With regards to his diabetes, Plaintiff testified that he had taken his blood sugar readings since he was diagnosed, that his highest blood sugar reading was around five hundred (500), and that his lowest blood sugar reading was around ninety-two (92). (Tr. 57). He stated that he was able to tell when his blood sugar was high before even taking a reading because he would feel light-headed and his legs and feet would burn. (Tr. 58). He noted that eating helped to bring his sugar back down, but that he would still have symptoms. (Tr. 58). He testified that he was unable to tell when his sugar was low other than feeling tired and confused. (Tr. 59-60). He stated that he had high blood sugar readings "pretty much every day." (Tr. 60).

At his remand hearing on April 15, 2014, Plaintiff testified that, since the initial hearing in 2012, due to increased leg numbness resulting from peripheral neuropathy, he underwent surgery to repair the nerves in his legs, which helped for

6

about three (3) months before his symptoms returned in an increased state. (Tr. 33). He stated that the leg pain was "like hitting your thumb with a hammer." (Tr. 34). Plaintiff stated that his leg pain and numbness were constant, that he had "extra pain" about twice a week for four (4) hours at a time, and that he took Vicodin and Methadone for pain relief. (Tr. 35). However, he reported that these medications took only "some of the pain away." (Tr. 35). When his "extra pain" occurred, he had to sit down immediately, and stated that he would not be able to read a newspaper with this type of pain because it was excruciating. (Tr. 36-37). He stated he was able to wash "two whole dishes," sweep the floors once a week, and "do a little walking around the house." (Tr. 36).

## MEDICAL RECORDS

On May 12, 2011, Plaintiff presented to Mark Pinker, DPM with complaints of burning feet, including sharp, shooting pains that had been occurring "over the past 4-6 months and [were] getting significantly worse." (Tr. 372). The pain was always present, including during weightbearing and non-weightbearing activities, and caused sleep difficulties. (Tr. 372). It was noted that his sugar was high in the "300 hundred range." (Tr. 372). An orthopedic examination revealed no gross deformities in either foot, normal range of motion of the bilateral ankles, ST joint, MT joint and without pain bilaterally except for "ST joint eversion which does elicit discomfort across the balls of both feet near the 5th metatarsal area," and

7

discomfort upon palpation of both balls of the feet. (Tr. 373). It was noted that Plaintiff's stance and gait were unremarkable although he had some trepidation about "dorsiflexing across the balls of both feet when he walks forward." (Tr. 373). His deep tendon reflexes were intact and symmetrical, and his epicritic sensations were within normal limits to light touch and vibratory sensations. (Tr. 373). Plaintiff was assessed as having uncontrolled Diabetes Mellitus, diabetic peripheral neuropathy, and pain and metatarsalgia in his feet bilaterally. (Tr. 373). It was suggested to Plaintiff that he be evaluated by an Endocrinologist to get his blood sugars under control, to cease smoking and chewing tobacco, and to take Neurontin for the neuropathy in his feet. (Tr. 373). On June 2, 2011, Plaintiff did not show for his follow-up appointment. (Tr. 373).

On May 13, 2011, Plaintiff had an appointment with Louie Myers, D.O. due to complaints of chest pain, foot pain, and poorly controlled diabetes. (Tr. 382). It was noted that Plaintiff smoked cigarettes. (Tr. 383). Dr. Myers ordered a nuclear stress test due to symptoms "concerning for stable angina." (Tr. 383).

On June 22, 2011, Plaintiff underwent a chest x-ray. (Tr. 394). This test showed no pleural effusion. (Tr. 394). Plaintiff also had an appointment with Rena C. DeArment, M.D. for Diabetes Mellitus. (Tr. 421). It was noted that Plaintiff's blood sugar levels were uncontrolled and that he had peripheral neuropathy with considerable lower extremity numbness, tingling, and pain. (Tr.

8

421).  His physical examination revealed that he had no edema or calf tenderness in his bilateral lower extremities. (Tr. 422).  Plaintiff was assessed as having Diabetes Mellitus- Type 2, and was placed on insulin. (Tr. 422).

On July 20, 2011, Plaintiff had a follow-up appointment with Dr. DeArment for his diabetes. (Tr. 419).  His blood sugar level on the insulin remained "in the 200's" with no lows. (Tr. 419).  Plaintiff denied experiencing the following: fatigue, tingling, numbness, and cold and heat intolerance. (Tr. 419).  His physical examination was normal. (Tr. 420).  Plaintiff was instructed to increase his insulin and to begin mealtime insulin. (Tr. 420).

On August 15, 2011, Plaintiff had a follow-up appointment with Dr. DeArment for diabetes. (Tr. 417).  It was reported that Plaintiff's blood sugar levels remained in the two hundred (200) range with no hypoglycemic episodes and that he continued to have neuropathy in his feet. (Tr. 417).  Plaintiff denied experiencing fatigue and cold or heat intolerance. (Tr. 417).  Plaintiff was instructed to continue insulin. (Tr. 418).

On August 31, 2011, Plaintiff underwent a nuclear stress test for the following indications: "exertional CP, CAD, s/p RCA stenting (07), tobacco abuse, diabetes mellitus and hypertension." (Tr. 384).  The conclusion of the test was as follows: "Borderline positive pharmacologic stress test for ischemia by EKG criteria.  No cardiovascular symptoms.  Mildly abnormal myocardial

perfusion study.  There is a moderate sized area of mild to moderate scarring/ infarction involving the basal/ mid inferior wall." (Tr. 384).

On September 19, 2011, Plaintiff presented to the Carlisle Regional Medical Center due to generalized abdominal pain. (Tr. 399).  An examination revealed Plaintiff was positive for back pain and obesity, had a normal joint range of motion with no swelling, deformities, cyanosis, clubbing, or edema, and had no sensory or motor deficits. (Tr. 399-400).  Plaintiff underwent a CT scan of his abdomen and pelvis due to complaints of right flank pain. (Tr. 395).  The impression was that there was no obstructive uropathy on the right, that there was evidence of prior left nephrectomy, and that there was epiploic appendigitis adjacent to the splenic fixture. (Tr. 396).

On November 18, 2011, Plaintiff presented to the Carlisle Regional Medical Center due to complaints of leg swelling and pain that began earlier in the day. (Tr. 407).  It was noted that Plaintiff was unable to flex his knees, denied numbness and tingling, rated his pain at a "2/2," and had warmth over the affected knee. (Tr. 407).  Plaintiff was diagnosed with "gout, knee effusion," and was prescribed pain medications. (Tr. 412).

On November 29, 2011, Plaintiff had a follow-up appointment with Dr. DeArment for diabetes management. (Tr. 415).  Plaintiff reported that his feet still hurt, but that he did not follow up for this problem, and that his blood sugars were

routinely below two hundred (200) with no lows. (Tr. 415). He denied heat and cold intolerance and fatigue. (Tr. 415). Plaintiff was prescribed Cymbalta for his neuropathy and was instructed to continue taking his insulin. (Tr. 415).

On February 21, 2012, Dr. Phelan opined that Plaintiff was permanently disabled based on physical examination and clinical records due to coronary artery disease, diabetes, peripheral neuropathy, gastrointestinal reflux disease, hyperlipidemia, and hypertension. (Tr. 555).

On May 3, 2012, Plaintiff had an appointment with Dr. DeArment for a follow-up for diabetes. (Tr. 494). He reported he continued to have foot pain, had been sweating from his knees down at night, that his blood sugar levels were in the two hundred (200) range, and that he did not have low blood sugar. (Tr. 494). His physical examination was normal. (Tr. 495). Dr. DeArment increased Plaintiff's insulin dose, and referred him to Dr. Kosenski for his "quite severe" neuropathy. (Tr. 495).

On July 16, 2012, Plaintiff had an appointment with Marlene Ascione, D.O. as a new patient. (Tr. 538). Plaintiff denied experiencing muscular aches and weakness, and numbness and tingling. (Tr. 539). His examination was normal. (Tr. 538). He was assessed as having the following: controlled Diabetes Mellitus; hypertension; gastroesophageal reflux disease; hypercholesterolemia; coronary artery disease; chronic pain; and cellulitis. (Tr. 538).

On September 14, 2012, Dr. Phelan completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." (Tr. 502).  He opined Plaintiff: (1) could occasionally lift up to twenty (20) pounds maximum; (2) could occasionally carry up to ten (10) pounds maximum; (3) could sit for eight (8) hours, stand for four (4) hours, and walk for three (3) hours at one time without interruption and in an eight (8) hour workday; (3) could continuously for over two thirds (2/3) of the day reach, handle, finger, and feel with bilaterally with his hands; (4) could frequently for one third (1/3) to two thirds (2/3) of the day reach overhead and push and pull bilaterally with his hands; (5) could occasionally up to one third (1/3) of the day operate foot controls bilaterally; and (6) could never climb stairs, ladders, ramps, or scaffolds, balance, stoop, kneel, crouch, or crawl. (Tr. 502-507).

On October 13, 2012, Plaintiff had an appointment with Mark Stutzman, D.O. after falling and landing on his back days earlier that resulted in low back pain. (Tr. 540).  Plaintiff reported that he had been seeing a pain management specialist for his foot neuropathy, and that the Lyrica and Tramadol he was taking to control this problem were helping. (Tr. 540).

On February 22, 2013, Plaintiff had an appointment at Carlisle Regional Medical Center. (Tr. 565).  Plaintiff reported that he continued to have leg pain, numbness, and tingling, and was there to have a disability form completed. (Tr.

565).

On March 6, 2013, Plaintiff had an appointment with Dr. Steber for a follow-up of his bilateral lower extremity pain. (Tr. 575). Plaintiff reported that his bilateral lower extremities "hurt all the time, both during the day and at night" and that the pain was unrelenting. (Tr. 575). A physical examination revealed that he had hypersensitivity to his bilateral lower extremities. (Tr. 575). Plaintiff received "40 minutes of neurogenices level 9 automatic, supplemented with therapeutic nerve injections on the posterior tibial nerve and superficial peroneal nerves bilaterally." (Tr. 575).

On March 14, 2013, Plaintiff had an appointment with Dr. Steber. (Tr. 561). Plaintiff's examination revealed he had immediate capillary refill time, normal proximal to distal cooling, normal ankle joint and subtalar range of motions, pain-free on muscle testing of the dorsiflexors, plantar flexors, inverters, and everters bilaterally, a lack of sensation distal to his ankles, and Tinel's sign positive. (Tr. 561). Plaintiff was scheduled for a neurolysis procedure. (Tr. 561).

On March 16, 2013, Plaintiff underwent an epidermal nerve fiber density analysis. (Tr. 556). It was noted that the "utter absence of fibers following immunohistochemical analysis using anti-PGP 9.5 antibodies is indicative of advanced small fiber neuropathy." (Tr. 556). It was also noted that there was a "virtual loss of all small myelinated and unmyelinated nerve fibers within the

13

epidermis" and that" fibers within the papillary dermis are greatly diminished."
(Tr. 556).

On April 3, 2013, Plaintiff had an appointment with Dr. Steber as a follow-up after he underwent an "epidermal neural fiber density analysis" conducted due to complaints of pain and numbness of the bilateral lower extremities. (Tr. 547). It was noted that Plaintiff was positive for restless legs and balance issues. (Tr. 547). His examination revealed the following: immediate capillary refill; normal proximal to distal cooling; and "Tinel's sign per percussion bilateral posterior tibial nerves, deep peroneal nerves, common peroneal nerves and compression of the emdial calf in the synovial sling region." (Tr. 547). Plaintiff was assessed as having entrapment neuropathy bilaterally in the common and deep peroneal nerves and the tarsal tunnel in synovial slings. (Tr. 547).

On April 16, 2013, Plaintiff underwent surgery performed by Dr. Steber for entrapment neuropathy in his bilateral peroneal, deep peroneal, tarsal tunnel and soleal sling nerves in his lower extremities. (Tr. 543).

On April 23, 2013, Plaintiff had a post-surgical appointment with Dr. Steber. (Tr. 559). It was noted that there were "aspects of his foot for which he can feel the sensation" and that prior "to his surgery, he could not feel anything below the ankle region." (Tr. 559). Plaintiff was instructed to keep taking the antibiotics and use his Ace bandage for edema control. (Tr. 580).

14

On May 2, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Steber. (Tr. 579). His physical examination revealed intact sutures with erythema and irritation. (Tr. 579). The sutures were removed, and it was noted that Plaintiff was "happy with the procedure and has essentially no pain." (Tr. 579). However, his toes were still numb. (Tr. 579).

On May 23, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Steber. (Tr. 578). Plaintiff reported that he experienced pain at night at "almost the same intensity as what is was before surgery, but overall he has increased motion of the ankles and digits, which is better." (Tr. 578). Plaintiff's physical examination noted that he had increased sensation to the distal third of both feet. (Tr. 578).

On June 11, 2013, Plaintiff had a post-surgical follow-up appointment with Dr. Steber. (Tr. 577). Plaintiff reported that his feet hurt at night, and that he had been experiencing fevers and night sweats. (Tr. 577). His physical examination revealed minimal nonpitting edema, but no erythema, no sign of acute infection of the lower extremities, and no pain on calf compression. (Tr. 577). It was noted that compared "to preoperatively, he does relate feeling better, but he still has a long way to go." (Tr. 577).

On July 9, 2013, Plaintiff had an appointment with Dr. Steber for an evaluation of his legs. (Tr. 576). Plaintiff reported he had sharp pain in his calves

that was present day and night and pain throughout his legs and feet. (Tr. 576).

His physical examination revealed pain upon compression of his calves bilaterally,

manual muscle testing that was 5/5 of the dorsiflexors, plantar flexors, invertors,

and evertors bilaterally, and intact sensation to light touch and proprioception.

(Tr. 576). Plaintiff was sent for venous Doppler of his calves to rule out Deep

Vein Thrombosis. (Tr. 576).

On April 15, 2014, at the oral hearing, Dr. Owens opined that Plaintiff

could: (1) occasionally lift twenty (20) pounds and frequently lift ten (10) pounds;

(2) sit for six (6) hours in an eight (8) hour workday; (3) stand for four (4) hours

and walk for two (2) hours in an eight (8) hour workday; (4) could not climb

ladders or scaffolding; (5) could climb stairs and ramps; (6) could not use foot

controls, but could use hand controls; (7) would not be able to work at unprotected

height or around moving mechanical part or machinery; (8) would not be able to

drive commercially; and (9) would require a sit/stand at will option. (Tr. 39).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

17

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

**ALJ DECISION**

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through December 31, 2016. (Tr. 16). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of December 30, 2010. (Tr. 16).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "Diabetes Mellitus with Peripheral Neuropathy and Coronary Artery Disease (20 C.F.R. 404.1520(c))." (Tr. 16).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of section 1.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (Tr. 16-17).

At step four, the ALJ determined that Plaintiff had the RFC to perform a range of light work with limitations. (Tr. 17). Specifically, the ALJ stated the following:

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b). [Plaintiff] is capable of lifting 20 pounds occasionally and 10 pounds frequently, sitting up to 6 hours in an 8 hour workday and standing for 4 hours in an 8 hour workday. [Plaintiff] requires the option to alternate sitting and standing at will. [Plaintiff] is prohibited from operating foot controls and climbing ladders, ropes and scaffolds. [Plaintiff] is required to avoid exposure to unprotected heights and moving machinery parts. [Plaintiff] is prohibited from commercial driving.

(Tr. 17).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform past relevant work, but that given his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform.  (Tr. 23).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time from December 30, 2010 through the date of the decision.  (Tr. 24).

## DISCUSSION

On appeal, Plaintiff alleges that: (1) the ALJ erred in weight he afforded to Dr. Owens' opinion by "failing to explain why he did not credit all of the medical expert's statements while at the same time giving his testimony great weight in general" and the weight he afforded to the opinions of his treating physicians; (2)

the ALJ erred in failing to include all of Plaintiff's "well supported impairments in his hypothetical questions to the [VE];" and (3) the ALJ erred in his credibility determination of Plaintiff.  (Doc. 16, pp. 14, 16-23).  Defendant disputes these contentions.  (Doc. 17, pp. 11-27).

### 1.   Medical Opinion Evidence

Plaintiff asserts that the ALJ erred in the weight he assigned to the medical opinions of Dr. Owens, Dr. Phelan, and Dr. DeArment.  (Doc. 16, pp. 16-20).  More specifically, he argues that the ALJ erred in not giving greater weight to Plaintiff's treating phsyicians, Dr. Phelan and Dr. DeArment, and in failing to adopt in its entirety Dr. Owens' medical opinion.  This Court will address these assertions in turn.

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the relevant medical opinion evidence from Plaintiff's treating physicians, the ALJ gave the opinion of Dr. Phelan provided in a Department of Public Welfare Employment Assessment form significant, yet not controlling, weight because this opinion was consistent with and supported by the objective clinical findings. (Tr. 21). However, the gave little weight the Dr. Phelan's assessment that Plaintiff was permanently disabled as rendered in the Employment Assessment Form for the Department of Public Welfare because it was conclusory and without adequate evidentiary support. (Id.); See Mason v. Shalala, 994 F.2d 1058, 1065 (3d Circ. 1993) ("[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" and the reliability

of this type of form is suspect at best) (citing <u>Brewster v. Hecker</u>, 786 F.2d 581, 585 (3d Cir. 1986)).  The ALJ gave limited weight to the opinion of Dr. DeArment because it was not supported by and was inconsistent with the objective medical evidence because the record notes that Plaintiff was neurologically intact, was in no acute distress, and had normal strength and sensation.  (Tr. 21).  According to the Third Circuit Court of Appeals, when an ALJ determines that the opinion of a treating physician is "inconsistent with the other medical evidence of record and with his own progress notes," the administrative law judge does not err in assigning less than controlling or no significant weight to the opinion of that treating physician.  <u>Burke v. Commissioner of Social Security</u>, 317 F. App'x 240, 243 (3d Cir. 2009).  As such, substantial evidence supports the weight the ALJ afforded to Plaintiff's treating physicians because a review of the record shows they were unsupported by and inconsistent with the medical record.

Regarding Plaintiff's assertion that the ALJ erred in not adopting Dr. Owens' opinion in its entirety, the Third Circuit has determined that remand is not automatically required when significant weight is afforded to an opinion without adoption of all the limitations opined in that medical opinion, stating "no rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant weight'" and "the ALJ was not required to adopt all of Dr. Ali's

opinion solely because she found the opinion as a whole persuasive." Wilkinson

v. Commissioner of Social Security, 558 Fed. App'x 254, 2014 WL 840925, at *2

(3d Circ. March 5, 2014).  The ALJ found that Dr. Owens' opinion regarding

Plaintiff's concentration ability was not supported by the medical record and was

based on subjective complaints.  Thus, the ALJ did not ignore this portion of Dr.

Owens' opinion, but rather addressed and explained his reasoning for not giving

great weight to this portion of the opinion, and therefore substantial evidence

supports this determination.

Upon review of the entire record and the ALJ's RFC determination, it is

determined that the ALJ properly afforded weight to the opinion evidence, and

based on the RFC, did not err in the weight he afforded to the medical opinions.

Substantial evidence supports the weight the ALJ afforded to the medical

opinions, and the determination will not be disturbed on appeal on this ground.

### 2.   Vocational Expert Hypotheticals

Plaintiff next asserts that the ALJ erred in the hypothetical questions he

posed to the VE because he failed to include "any deficits in concentration due to

the periodic increased levels of pain." (Doc. 16, pp. 20-21).  Plaintiff bases this

alleged concentration deficit on his own subjective complaints he explained to the

ALJ during the oral hearing and on the opinion rendered by Dr. Owens that if

Plaintiff had experienced the alleged level of pain that, according to Dr. Owens,

27

would be unusual, he may have difficulty concentrating.  (Tr. 41-42).

It is within the ALJ's discretion to include in the RFC determination only the limitations he finds credible, and as long as the limitations included in the RFC determination are presented to the VE in the hypotheticals, the hypotheticals and VE's testimony are supported by substantial evidence.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (the hypotheticals an administrative law judge poses to a vocational expert need only include the impairments and limitations that are credibly established by the record) (emphasis added); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999); Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004).

With regards to the alleged concentration limitation that Plaintiff asserts should have been included in the hypothetical to the VE, Dr. Owens stated that the pain Plaintiff allegedly experience due to the peripheral neuropathy was "a bit unusual" and that "[m]ost times the neuropathy [would not cause] those sudden [pain] attacks.  I can't explain them."  Dr. Owens also testified that if Plaintiff did indeed experience that level of pain, it would significantly impact his ability to focus and concentrate.  (Tr. 42) (emphasis added).  He then stated that if Plaintiff did have these episodes of pain, that he would need to sit down if his physicians could not "find some kind of treatment medically with pain medicine or other

medication" and that "he would not be able to function productively" during the times of increased pain. (Tr. 42) (emphasis added). However, this opinion rendered by Dr. Owens was based on speculation and Plaintiff's self-reported symptoms, not on any objective medical evidence from the record. Furthermore, in the Function Report completed by Plaintiff, when asked to check what activities his illnesses, injuries, or conditions affected, Plaintiff did not check understanding or following instructions. (Tr. 285). The remainder of the complaints of concentration issues due to pain were based on Plaintiff's self-reported symptoms during the hearing, and were not based on anything contained in the medical record. This Court cannot find an instance in the medical record where a physicians stated that Plaintiff's concentration was an issue.  The ALJ therefore did not need to include any concentration limitation in his RFC because it was not supported by the medical record and thus was not a credibly established limitation.

Instead, the ALJ included all credibly established limitations in the hypotheticals presented to the VE, and the VE responded that, given the limitations included in the hypothetical question, Plaintiff would be capable of performing numerous light exertional jobs in the national economy. (Tr. 44).  As such, because the ALJ presented all credibly established limitations to the VE, and the VE responded that given the hypotheticals, Plaintiff would be able capable of

29

performing light work present in the national economy, the ALJ's hypotheticals to the VE are supported by substantial evidence, and the ALJ's decision will not be disturbed on appeal based on this argument.

### 3.    ALJ's Credibility Determination of Plaintiff

Lastly, Plaintiff argues that the ALJ's credibility finding is not based on substantial evidence. (Doc. 12, pp. 25-30). More specifically, Plaintiff asserts that the ALJ erred in finding Plaintiff to not be entirely credible in his statements regarding the intensity, persistence, and limiting effects of his symptoms because his "statements are consistent with opinion evidence from Dr. Phelan, Dr. DeArment and even the medical expert, Dr. Owens as set forth above" and the ALJ failed to point to any medical evidence inconsistent with his Plaintiff's testimony. (Doc. 16, p. 21).

Plaintiff also asserts that the ALJ erred in failing to address the third-party testimony of his wife. (Id.). Failure to address third-party statements generally renders a credibility assessment defective. As the Third Circuit has explained:

> Similar to the medical reports, the ALJ must also consider and weigh all of the non-medical evidence before him. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir.1983); Cotter, 642 F.2d at 707. Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, see Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529), the ALJ must still explain why he is rejecting the testimony. See Van Horn, 717 F.2d at 873. In Van Horn, this

Court set aside an ALJ's finding because he failed to explain
why he rejected certain non-medical testimony. <u>See</u> 717 F.2d
at 873. In this case, the ALJ explained he rejected Burnett's
testimony regarding the extent of her pain because he
determined it was not supported by the objective medical
evidence. However, the ALJ failed to mention the testimony of
Burnett's husband, George Burnett, and her neighbor, Earl
Sherman. On appeal, the Commissioner contends the ALJ did
not need to mention their testimony because it "added nothing
more than stating [Burnett's] testimony was truthful."
Commissioner's Brief at 21. This argument lacks merit because
the ALJ made a credibility determination regarding Burnett,
and these witnesses were there to bolster her credibility. R. 17
("claimant's allegations of disability made at hearing are
unsubstantiated"). In <u>Van Horn</u>, we stated we expect the ALJ
to address the testimony of such additional witnesses. On
remand, the ALJ must address the testimony of George Burnett
and Earl Sherman.

<u>Burnett v. Commissioner of Social Security Administration</u>, 220 F.3d 112, 122 (3d

Cir. 2000). Therefore, <u>Burnett</u> explicitly states that the Third Circuit "expect[s]

the ALJ to address the testimony of such additional witnesses." <u>Id.</u> at 122. The

ALJ did not address the testimony provided by Plaintiff's wife who testified to

bolster Plaintiff's credibility. (Tr. 71-76). Based on the holding in <u>Burnett</u> and

subsequent holdings rendered in the United States District Court for the Middle

District of Pennsylvania, the ALJ erred in failing to acknowledge in his opinion

the testimony of Plaintiff's wife because if the ALJ had considered the statements

made by Plaintiff's wife regarding Plaintiff's limitations physically and with

31

concentration, he may not have arrived at the same determination. See Haubert v.

Colvin, 214 Soc. Sec. Rep. Service 143 (M.D. Pa. 2015) (Cohn, J.).[8] Thus, the

ALJ's failure to address the testimony of Plaintiff's wife precludes meaningful

review of the ALJ's credibility assessment. See Diaz v. Comm'r of Soc. Sec., 577

F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of the

---

8. While this Court's appreciates Defendant's assertion that the ALJ implicitly
acknowledged the testimony of Plaintiff's wife when he stated he considered the
"entire record," and that the ALJ does not have the obligation to discuss all "other
source" statements, the Third Circuit has made it clear that the ALJ has a duty to
address third-party statements when determining Plaintiff's credibility.
Furthermore, it cannot be determined with certainty that the outcome of the case
would have been the same had the ALJ directly addressed the testimony of
Plaintiff's wife because the rationalizations provided by Defendant in support of
the ALJ's decision that the outcome of the disability determination would have
been the same if the ALJ addressed Plaintiff's wife's testimony substances are
post-hoc rationalizations as they were not discussed by the ALJ in his opinion.
(Doc. 17, pp. 25-26). It is well-established that, in reviewing an administrative
law judge's decision, the District Court cannot supply its own reasons to explain
or support the administrative law judge's decision. Fargnoli v. Massanari, 247
F.3d 34, 44 n.7 (3d Cir. 2001). Rather, the District Court is permitted to analyze
only those explanations that the administrative law judge actually provides for in
his decision. Id. "In the absence of such an [explanation], the reviewing court
cannot tell if significant probative evidence was not credited or simply ignored."
Burnett, 220 F.3d at 121. As such, this Court is not permitted to review these
explanations provided by Defendant in support of the ALJ's decision.
    It is noted that, in considering the testimony of the Plaintiff's wife in
determining Plaintiff's credibility, the ALJ may very well reach the same
conclusion. However, in accordance with the Third Circuit precedent established
in Fargnoli v. Halter, this Court cannot satisfy its obligation to determine whether
substantial evidence supports the ALJ's decision in the absence of an indication
that the ALJ considered the third-party witness statement given by Plaintiff's wife.

evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review") (quoting <u>Burnett</u>, 220 F.3d at 120).  As such, the matter will be remanded to the ALJ for consideration of the testimony of Plaintiff's wife.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated, and the appeal will be granted.

A separate Order will be issued.

**Date**: February 17, 2017


/s/ **William J. Nealon**
**United States District Judge**

33